FILED

2017 Mar-23  AM 11:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF LABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| ANGELA LEIGH STEPHENSON, | ) | |
| | ) | |
| CLAIMANT, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 7:16-CV-79-KOB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| RESPONDENT. | ) | |
| | ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On June 22, 2012, the claimant, Angela Leigh Stephenson, protectively applied

for disability benefits under Title II of the Social Security Act. (R. 121-124). The

claimant alleged disability beginning on July 15, 2010, because of anxiety, bipolar

disorder, and back pain. (R. 14). The Commissioner denied the claims on September 19,

2012.  The claimant filed a timely request for a hearing before an Administrative Law

Judge, and the ALJ held a hearing on January 27, 2014. (R. 27-49).

In a decision dated May 6, 2014, the ALJ found that the claimant was not disabled

as defined by the Social Security Act and was, therefore, ineligible for social security

benefits. (R. 11-26). On November 20, 2015, the Appeals Council denied the claimant's

requests for review. (R. 1-4). Consequently, the ALJ's decision became the final decision

of the Commissioner of the Social Security Administration. The claimant has exhausted

1

her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. ISSUES PRESENTED

A. Whether the ALJ erred in evaluating the claimant's allegations of pain and other limiting effects of her symptoms under the pain standard because substantial evidence does not support his findings.

B. Whether the ALJ erred in giving less than significant weight to the opinion of the claimant's treating physician Dr. Graham.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of

vocational factors, "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific
    impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the
next question, or, on steps three and five, to a finding of disability. A
negative answer to any question, other than step three, leads to a
determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520,

416.920.

## V. FACTS

The claimant was forty-three years old at the time of the ALJ's final decision (R.

26, 121); has a GED (R. 37); has past relevant work as a cashier, laborer, and daycare

worker (R. 56); and alleges disability based on anxiety, bipolar disorder, and back pain

(R. 33, 50).

### *Physical Impairments*

The claimant's medical records reveal that Dr. Harry L. Richardson with Reform

Medical Clinic treated the claimant for back pain since at least June 25, 2010.  On that

date, the claimant reported having stabbing, sharp pains in her back that radiated down

her right leg.   Dr. Richardson's physical examination of the claimant revealed tenderness

in her back with pain with range of motion, and he prescribed Lortab for pain, Ambien

for insomnia, and Seroquel for her depression and anxiety.  (R. 230-231).

At return visits to Dr. Richardson on July 23 and August 30, 2010, the claimant

continued to complain of chronic pain in her back, and Dr. Richardson noted tenderness

in her back and pain with range of motion on both visits.  During the August 30 visit, the

4

claimant noted that the medications did not control her back pain, and Dr. Richardson included a prescription for Darvocet for pain. He also referred the claimant to Dr. Chester Boston for an assessment of her back pain. (230-238).

The claimant saw Dr. Boston at the University Orthopaedic Clinic & Spine Center on September 22, 2010. The claimant reported that she had pain and stiffness in her lumbar region for about eight years; that bending, sitting, and walking aggravated her symptoms; that the pain radiated from her back to her right buttock and thigh; that she had numbness in her lower extremity occasionally; and that Dr. Graham[1] gave her numerous epidural blocks in the past that gave her limited relief. Dr. Boston noted that the claimant had physical therapy in the past without relief. Upon physical examination, Dr. Boston reported that the claimant had a normal, non-antalgic gait, but had tenderness and pain in the SI Joint on the right side. He ordered x-rays of her lumbar spine that showed no evidence of spondylolysis and ordered an MRI of her spine.

The claimant underwent the MRI of her spine on October 20, 2010 at the University Orthopaedic Clinic in Tuscaloosa. (R. 353-356). The MRI revealed lumbarization of SI; a right lateral bulge at LI-L2 that contributes to some mild foraminal narrowing; a diffuse bulge and facet hypertrophy at L4-L5 that led to mild foraminal narrowing; and a diffuse bulge at L5-S1 that is slightly greater toward the left that has caused facet hypertrophy and moderate bilateral foraminal narrowing "with crowding of the exiting roots." (R. 351-352).

---

[1]  The official record in this case contains medical records from Dr. Graham beginning in July 2011, so the court cannot verify the accuracy of any treatment of the claimant by Dr. Graham before that time.

The claimant returned to Dr. Richardson on May 5, 2011, and he noted that she had back tenderness with muscle spasms and pain with range of motion.  He also noted neck tenderness in her "bilateral paracervical aspect" with muscle spasms and pain with range of motion in her neck.  (R 227-229).

On Dr. Richardson's referral, the claimant sought treatment with Dr. Fred Graham with West Alabama Spine & Pain Specialists in Tuscaloosa from at least 2011 until 2014. During that time frame, the record contains notes from visits the claimant had with Dr. Graham on July 13, 2011; February 22, June 6 and November 1, 2012; and April 8, and October 7, 2013.  (R. 263-274, 324-338).

At the July 2011 visit with Dr. Graham, the claimant reported low back pain that radiated into her legs and muscle spasms.  She also stated that she tried physical therapy in the past but it "hurts me worse" and that her current medications were not working. Dr. Graham gave her an injection; ordered an x-ray of her lumbar spine; and added Flexeril and SEC cream for joint stiffness. At her next visit on February 22, 2012, she said her pain had worsened, but that the SEC cream did help with join stiffness in her arms.  Dr. Graham continued the claimant on the Lortab and Flexeril and told her to follow-up with him in four months.

On June 6, 2012, the claimant reported to Dr. Graham that her pain in her back was about the same as the last visit, and Dr. Graham prescribed Norco for pain, in addition to the Lortab and Flexeril.  Several months later at the November 1 visit, the claimant reported that her pain in her lower back that radiated to her right leg had worsened since the last visit and that the Norco was not helping her pain.  She also complained of numbness, weakness, and tingling in her extremities.  Her range of motion

6

was normal during this visit, but Dr. Graham changed her Norco prescription to Percocet because of her alleged increase in pain. (R. 267-268, 335-338).

At the request of the Social Security Administration, the claimant completed a "Function Report-Adult" on July 5, 2012.  In that report, the claimant said she writes, reads books, and watches her daughter play with the dog through the window. She stated that her daughter takes care of the dog; she has trouble sleeping; her husband makes sure she takes her medications on time; she does not cook; she washes clothes sometimes; she goes out alone sometimes; she sometimes goes to the store with her husband about once a week; she cannot handle a savings account or use a checkbook; and she watches television.  (R. 192-196).

Her Function Report indicated that she cannot spend much time around people because she gets paranoid and agitated and does not go many places except to the doctor every two months with someone accompanying her.  The claimant reported that she does not have much contact with her family or friends; her back problems keep her from doing a lot of things; and her mental problems affect her memory.  She cannot pay attention for long; follows written instructions "ok" because she can re-read them; does not follow spoken instructions well unless repeated; cannot handle stress or changes in routine well; and has unusual behavior of wanting to hurt herself.

The claimant returned to Dr. Graham on April 8, 2013 complaining that her pain increased since her last visit; that her pain now also radiates to her left leg; and that the Percocet makes her nauseous.  Dr. Graham decreased her Percocet prescription from 10 to 7.5 milligrams and ordered a lumbar epidural steroid injection to reduce the

inflammation around the spinal nerves. He noted that depending on the results of the epidural block he may want an updated MRI.  (R. 331-334).

On April 12, 2013, the claimant underwent the epidural procedure at Northport Medical Center with no complications. The diagnoses on the epidural procedure medical notes include "Low back pain, lumbar spondylosis, disc disease, and sacralized L5."  (R. 330).

At her next visit with Dr. Graham on October 7, 2013, the claimant stated that the epidural block provided "some" relief, but that she is unable to get another because of insurance.  Dr. Graham discontinued the Percocet prescription and restarted Norco because Percocet makes the claimant sick to her stomach; discussed her risk of opioid abuse; and a proposed treatment plan to include therapy for her psychiatric history.  (R. 326-329).

At the request of the claimant's attorney, Dr. Graham completed a "Clinical Assessment of Pain" for the claimant on January 14, 2014.  Dr. Graham noted on the form that he was unable to answer impact the claimant's pain has on her ability to work because a Functional Capacity Evaluation would be the best tool to evaluate that impact. However, he indicated that the claimant's pain was "present to such an extent as to be distracting to adequate performance of daily activities and/or work."  He also noted that she has some side effects from her medications that are "only mildly troublesome" to the claimant and that treatments like injections have been successful in treating her pain.  For question 5 on the form, which instructed Dr. Graham to circle one letter, he circled both "B." and "C." that indicated that the pain "should diminish to an insignificant level but will still be present" and that, although her pain may be less intense and less frequent in

the future, "it will still remain a significant element in [the claimant's] life."  (R. 324-325).

*Mental Impairments*

Although the court's reversal and remand in this case are based primarily on her physical impairments, the claimant's mental impairments are important to understand the claimant's allegations regarding the overall limitations in her daily activities.  The claimant's mental health records begin in September 2009 with treatment from Dr. Richardson and Dr. Bruce Atkins, a psychiatrist with Psychiatric Corporation of Alabama, PC.  As noted above in the "Physical Impairments" section, Dr. Richardson treated the claimant for severe back pain and anxiety, and he referred the claimant to Dr. Atkins for specialized psychiatric care in September 2009.

The claimant's mental health records from Dr. Atkins range from 2009 to 2013 and show diagnoses of "Major Depression, recurrent, Panic Disorder"; anxiety; and bipolar disorder.  Over those years, Dr. Atkins prescribed the claimant numerous medications for depression and bipolar disorder, including Paxil, Xanax, Trazadone, Cymbalta, Effexor, and Seroquel.  At times, her medication seemed to control some of her symptoms, but at other times, her symptoms worsened.  (R. 275-306, 339-350).

Throughout her treatment for her mental impairments, the claimant suffered from severe panic attacks; had suicide thoughts; experienced paranoia when around people; and described herself as a "loner" who mostly stays in her house and wants people to leave her alone.  (R. 284-300).  On May 27, 2012, doctors admitted the claimant to the psychiatric wing of Northport Medical Center after a suicide attempt by slitting her wrists.  Doctors noted that she was coming off Lortab for her back pain during this time,

which may have contributed to her mental instability surrounding the suicide attempt. (R. 257-258). She later told Dr. Atkins that her suicide attempt was a "a stupid moment," and for a few months after that attempt, she seemed to be doing better by trying to stay "stress free." (R. 277-279).

On September 8, 2012, Dr. Sylvia Colvin, a psychiatrist, performed a mental assessment of the claimant at the request of the Social Security Administration. Dr. Colvin reviewed the claimant's records and personally examined the claimant. Dr. Colvin noted "multiple suicide attempts in the past" per the claimant's records, but stated that the claimant denied attempts other than the one in May 2012. The claimant described her daily activities as including preparing simple meals, playing with the dog, watching TV, doing some laundry, writing nonfiction stories, doing "some" cleaning, washing dishes, and "sometimes" going to church. After a thorough mental examination with no significant abnormal findings, Dr. Colvin diagnosed the claimant with bipolar disorder and chronic back pain and stated that the claimant "is able to handle funds. Symptoms of bipolar disorder are currently stable. The claimant is able to work and is involved in finding jobs." (R. 312-315.

Also at the request of the Social Security Administration, psychiatrist Dr. Robert Estock completed a "Mental Residual Functional Capacity Assessment" of the claimant on September 18, 2012 by reviewing her records. He found that the claimant had moderate limitations in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or close to others without being distracted; and complete a normal work day. He

specifically stated that she can sustain attention and concentration for two hours at a time to complete a normal workday at an acceptable pace; may require regular, but not excessive, work breaks during a work day; and may miss one or two days of work per month because of "exacerbation of psychiatric symptoms." (R. 70-71).

Regarding the claimant's social interactions, Dr. Estock found that the claimant was moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. Dr. Estock noted that the claimant can appropriately manage at least casual and informal contact with the general public, co-workers, and supervisors; should not have intensive or prolonged proximity to others; and may have difficulty interacting effectively with others when "taxed or stressed." (R. 71).

From September 24, 2012 to November 13, 2013, the claimant sought mental health treatment with Dr. Atkins on five occasions, describing her daily activities as "same o same o" and "up to not much of nothing." In the September 24, 2012 and May 6, 2013 visits, the claimant reported having night sweats. Dr. Atkins noted on January 7, 2013 that she was exhibiting symptoms associated with bipolar disorder with a "disheveled" appearance and anxious mood. During the May 6, 2013 visit, Dr. Atkins reported that the claimant had weaned off Cymbalta and was taking Effexor, Seroquel, and Neurontin, but she did not feel like the medications were working. Dr. Atkins also noted on November 13, 2013 that the claimant had a concerned mood and blunt affect; missed or delayed appointments because she could not afford her co-pays; stopped taking Effexor because she did not see any change; could be experiencing narcotic withdrawal

from a decrease in her Percocet dosage for her back pain; and reported being unable to concentrate on things even for a little while.  (R. 339-347).

*The ALJ Hearing*

At the hearing before the ALJ on January 27, 2014, the claimant testified that she lives with her husband and twenty-three-year-old daughter.  She last worked in July 2010 and does not have a driver's license but would drive "if there's no other way."  She stated that she has health insurance through her husband's job as a truck driver.  (R. 37, 46-48, 54).

She described that on a typical day she stays at home in her recliner and that is "basically all I do every day."  She stated that she needs to sit in the recliner with her right leg propped up to relieve her pain.  Her husband does the grocery shopping because she cannot stay in the store because of the people in the store.  She testified that she prepares simple meals with a microwave or makes a sandwich and that her husband and daughter "fend[] for themselves."  Her husband does the heavy cleaning like mopping and cleaning the bathrooms. When asked if she can do any household chores, she stated that she picks up after herself and just does "light things, but really no, I can't."  (R. 45, 47-48, 54).

When asked to choose one thing that keeps her from working, she stated her anxiety prevents her from working.  She has three to four panic attacks a week brought on by stress or being around a lot of people or in public.  Her pain level and her financial problems also cause her panic attacks.  She testified that she cannot be around people because she is paranoid they will touch her.  She used to go places with people but has not gone out in the last two years. She does not go to church anymore and missed her

12

niece's baptism because of her condition.  She suffered a panic attack at the hearing and had to take a break outside.  (R. 38-40, 49-50).

The claimant acknowledged her diagnosis of bipolar disorder and her suicide attempt in May 2012.  She testified that she has had no other suicide attempts since May 2012, but that she has thoughts of suicide "quite a bit."  After her hospitalization in 2012, her symptoms got worse.  (R. 42, 51).

Regarding her back pain, she described it as pain in her lower right side in her back that radiates down her right leg.  She said she has "herniated" and "bulging discs" and "degenerative disc disease" and receives treatment from Dr. Graham for her pain management.  On an average day from 8:00 am to 5:00 pm, she testified that her pain level is a constant 7/10 on the pain scale.  (R. 44-45).

Regarding her limitations because of her pain, she testified that she can sit fifteen to twenty minutes at a time; cannot stand very long because her right leg "would go numb"; can walk about forty-five minutes, but then her leg goes numb; and cannot climb stairs, stoop or bend because those activities cause her leg to go numb.  Her doctors told her to avoid heavy lifting, but she thinks she could lift five to ten pounds; however, she stated that lifting any amount of weight makes her pain worse.  (R. 51-54).

She testified that she takes medication at night to help her sleep and takes her other medications during the day.  She takes anxiety medications that "slow her down," and she takes Norco and prescription Ibuprofen for pain.  When taking her medications, she described that "I'm there but I'm not a hundred percent there."  (R. 41, 45).

A vocational expert, Ms. Smith,[2] testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Smith testified that the claimant's past relevant work was as a cashier, which is light, unskilled work; a laborer, stores, which is medium, unskilled work; and a daycare worker, which is light, semi-skilled work. (R. 56).

The ALJ asked Ms. Smith to assume a hypothetical individual the same age, education, and experience as the claimant with a residual functional capacity to perform light work who can occasionally stoop and crouch; cannot work at unprotected heights; cannot drive; cannot operate heavy machinery; and can work with things as opposed to the general public.  The ALJ asked Ms. Smith to disregard the claimant's past work for this hypothetical, and Ms. Smith testified that such individual could work as an odd piece checker, classified as light, unskilled work, with 9,000 jobs in Alabama and 500,000 in the nation; a price marker, classified as light, unskilled work, with 7,000 jobs in Alabama and 400,000 in the nation; and a garment sorter, classified as light, unskilled work, with 4,000 jobs in Alabama and 200,000 in the nation.  Ms. Smith also testified that such individual could work as a cuff folder, classified as sedentary, unskilled work, with 9,000 jobs in Alabama and 200,000 in the nation; a dowel inspector, classified as sedentary, unskilled work, with 7,000 jobs in Alabama and 400,000 in the nation; and as a toy stuffer, classified as sedentary, unskilled work, with 4,000 jobs in Alabama and 300,000 in the nation.  (R. 56-58).

In his second hypothetical, the ALJ asked Ms. Smith to assume all of the prior limitations plus the individual can only sit at one time for fifteen minutes and walk and/or

---

[2]  The record does not contain Ms. Smith's first name.

stand for forty-five minutes at a time.  Ms. Smith testified that individual could perform light work, but the number of jobs available would be reduced by thirty percent. She also stated that individual could work at the sedentary level as a cuff folder or dowel inspector, but not the toy stuff, and that the number of the cuff folder and dowel inspector jobs should be reduced by thirty percent.  (R. 58-59.)

In his third hypothetical, the ALJ eliminated the sit/stand limitation but added an additional limitation to his original hypothetical that the individual must elevate her right leg at least hip high.  Ms. Smith testified that no sedentary or light exertion level jobs would be available for this individual.  (R. 59-60).

In his last hypothetical, the ALJ asked Ms. Smith to take the limitations from his original hypothetical and add the limitation that the individual could have occasional contact and be in close proximity on an occasional basis with co-workers and/or supervisors.  Ms. Smith testified that individual could work at both the sedentary and light exertion jobs she previously mentioned.  However, if that individual could have no contact with co-workers and/or supervisors, no jobs at any exertional level would be available.  (R. 61).

The claimant's attorney asked Ms. Smith about how an individual's pain level would affect someone's ability to work.  She stated that a pain level of seven and above would preclude work because that person could not maintain concentration, persistence, and pace to complete a workday.  (R. 62).

### The ALJ's Decision

On January 23, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 11-20). First, the ALJ found that the claimant

met the insured status requirements of the Social Security Act through September 30, 2017, and had not engaged in substantial gainful activity since her alleged onset date of June 7, 2012.  (R. 13).

Next, the ALJ found that the claimant had the severe impairments of anxiety, back pain, and bipolar disorder.  The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 15).  The ALJ considered whether the claimant met the criteria for Listings 1.02A or 1.04, but found that the claimant met neither listing because no evidence showed that the claimant had the inability to ambulate; nerve root compression characterized by a neuro-anatomic distribution of pain or motor loss accompanied by sensory or reflex loss; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication. (R. 14).

The ALJ also found that the claimant's mental impairments did not meet Listings 12.04 or 12.06 because she did not have at least two marked restrictions in either activities of daily living; social functioning; ability to maintain concentration, persistence, or pace; or repeated episodes or decompensation.  The ALJ assessed the claimant as mildly limited in her activities of daily living because she can write; read books; watch her daughter play with the dog through the window; does not cook; and washes clothes sometimes.  (R. 15).

In social functioning, the ALJ said the claimant had moderate difficulties because she does not like to go places and attends medical appointments at least every two months. He also noted that her mental status affects her memory and ability to be around others and that she attends church sometimes.  Regarding her ability to maintain

concentration, persistence, and pace, the ALJ found that the claimant had moderate difficulties because "[o]n examination her mood was described as "'fairly well.' Her affect was full range and appropriate to thought content." He also found the claimant had experienced no episodes of decompensation. (R. 15-16).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work except she can occasionally stoop and crouch; cannot work at unprotected heights; cannot drive or operate heavy machinery; should work with things as opposed to the general public; can concentrate, focus, and pay attention for two hours at a time; can perform simple, repetitive, non-complex jobs; can occasionally have contact or be in close proximity with co-workers and/or supervisors. (R. 16).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record, which the ALJ recounted in much detail for seven pages in his decision.[3] The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. Specifically, the ALJ found that the claimant's descriptions of her limitations are "not entirely credible in light of the reports from treating and examining practitioners, medical history, high functioning daily activities and clinical findings upon examination." (R. 17-23).

The ALJ found that the claimant's pain was not to the degree she alleged because she "demonstrated no signs of disc herniation, nerve root compression or neurological

---

[3]   Although the ALJ spent many pages recounting the claimant's medical history in chronological order from 2009 to 2014, he did not mention the claimant's October 20, 2010 MRI discussed in detail in the court's physical impairment section of this Memorandum Opinion.

abnormality."  He noted that the record had no evidence of a "significant gait disturbance, [or] balance or coordination problem" and that she needed no assistive device to ambulate.  He also stated that medication controlled the claimant's mental conditions and that Dr. Atkins and Dr. Colon's notes "fail to substantiate disabling work related mental restrictions."  (R. 23).

Regarding Dr. Graham's opinion, the ALJ stated entirety that he carefully examined it but did not consider it "dispositive in light of his own clinical findings on examination, the other medical evidence of record and the claimant's admitted activities of daily living, which collectively, undermine[] his assertion that her pain is disabling." (R. 24).

The ALJ gave Dr. Colon's opinion "significant authority" because it was consistent with the cumulative record.  He also gave Dr. Estock's opinion "some weight" but gave his "speculation" that the claimant would be expected to miss one to two days of work each month "minimal weight" because the treating records do not establish that fact.  (R. 24).

The ALJ found that, given her residual functional capacity, the claimant could not perform her past relevant work.  However, based on the vocational expert's testimony at the hearing, the ALJ found that the claimant could work as an odd piece checker, a price marker, or a garment sorter, and that these jobs exist in significant numbers in the national economy.

Therefore, the ALJ concluded that the claimant was not disabled as defined in the Social Security Act.

## VI. DISCUSSION

### A.   *Pain Standard*

The claimant argues that the ALJ erred in evaluating her allegations of pain and other limiting effects of her symptoms under the pain standard because substantial evidence does not support his findings.  The court agrees and finds that substantial evidence does not support the ALJ's reasons for discrediting the claimant's subjective statements regarding the limiting effects of her pain and other symptoms.

The pain standard applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id*. (emphasis added).

A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).  In applying the pain standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).  Substantial evidence must support the ALJ's findings regarding the limiting effects of the claimant's symptoms.  *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987).

In the present case, the ALJ found that the claimant had medically determinable impairments that could "reasonably be expected to cause [her] some limitations in her ability to perform work related activities."  Yet, the ALJ found that the claimant's "description of her limitations are not fully credible in light of the reports from treating and examining practitioners, medical history, high functioning daily activities and clinical findings upon examination."  (R. 23).  However, substantial evidence does not support the ALJ's reasons for discrediting the claimant's statements.

One reason the ALJ gave for finding the claimant's subjective statements about her pain not fully credible was that the claimant "demonstrated no signs of disc herniation, nerve root compression or neurological abnormality."  Although the ALJ recounted the facts from the claimant's medical history in great detail in a chronological manner, notably he does not mention or discuss the MRI from October 20, 2010 that could support the claimant's allegations regarding her back pain.  That MRI showed lumbarization of SI; a right lateral bulge at LI-L2 that contributes to some mild foraminal narrowing; a diffuse bulge and facet hypertrophy at L4-L5 that led to mild foraminal narrowing; and a diffuse bulge at L5-S1 that is slightly greater toward the left that has caused facet hypertrophy and moderate bilateral foraminal narrowing "with crowding of the exiting roots."  (R. 351-352).  These findings could provide objective support for the claimant's allegations regarding the degree of her pain and limitations in combination with her other impairments.

The MRI from 2010 does not necessarily show a disc herniation, but the several bulges causing moderate foraminal narrowing and "crowding of the exiting roots" are significant findings that the ALJ failed to even mention or explain how those findings

20

would not support her allegations of pain.  The ALJ's failure to discuss the 2010 MRI and how its findings relate to the claimant's subjective allegations of pain was error.

The ALJ also indicated that the claimant's allegations regarding her pain and other symptoms were not fully credible because the evidence in the record did not show that she had a "significant disturbance, [or a] balance or coordination problem."  Again, the lack of these findings does not negate the presence of pain to the degree that the claimant alleges.  The claimant can have disabling pain without needing to walk with a cane or walker.  The ALJ gives no explanation as to how a lack of these findings would contradict the claimant's subjective statements and the court finds this reason lacks merit.

Interestingly, one of the reasons the ALJ articulated to support his finding that the claimant's statements were "not fully credible" was that she had "high functioning daily activities" that contradicted her allegations of severe pain.  However, contrary to the ALJ's findings, the court can find no such "high functioning" daily activities in the record.  The record does contain evidence, and the ALJ notes that the claimant can write, read books, watch her daughter play with the dog through the window, do occasional light chores like laundry, and watch television.  The claimant's ability to do these limited activities does not support the ALJ's finding that she is "highly functioning" in her daily activities, nor do these activities negate her own statements regarding the severity of her pain.  *See Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997) (finding that participation in everyday activities of short duration, such as housework or fishing, does not disqualify a claimant from disability).

The record reflects not only that the claimant does not have "high functioning" daily activities because of her back pain, but also that her mental impairments cause three

to four panic attacks a week, even while taking her medications, and cause to her to primarily remain in her home because of her paranoia associated with her bipolar disorder.  The ALJ ignores the claimant's testimony at the hearing in January 2014 that her typical day at that time involved sitting in her recliner with her right leg propped up to relieve her pain.  Over the course of several years between the times she complete her Function Report and she testified at the hearing, the claimant's activities of daily living decreased—she used to go to church sometimes but cannot go anymore; she no longer goes to the store with her husband because she cannot be around people; and she missed her niece's baptism at church because her impairments prevented her attendance.  The claimant suffered a panic attack at the hearing in January 2014 and no one, including the ALJ, suggested that her attack was feigned.

The court finds that substantial evidence does not support the ALJ's reasons for negating the claimant's subjective allegations of the limiting effects of her pain and symptoms, especially regarding her daily activities.

> ### B.   *Weight the ALJ Gave to Dr. Graham's Opinion*

The claimant also argues that the ALJ's reasons for giving her treating physician Dr. Graham's opinion little weight lack substantial evidence.  The court agrees.

Dr. Graham, who is a *pain specialist* and who treated the claimant for several *years*, found that the claimant's pain was "present to such an extent as to be distracting to adequate performance of daily activities and/or work."  The ALJ stated that he did not find Dr. Graham's opinion "dispositive in light of his own clinical findings on examination, the other medical evidence of record and the claimant's admitted activities of daily living, which collectively, undermine[] his assertion that her pain is disabling."

Although the ALJ did not specifically use the term "little," "some," or "no" weight to describe the weight he gave Dr. Graham's opinion, the court interprets the ALJ's few sentencings about Dr. Graham's opinion to mean that he gave it less than significant weight.

The ALJ must give a treating physician's opinion significant weight unless he articulates "good cause" to the contrary. *Lewis*, 125 F.3d at 1440. The Social Security regulations explain that an ALJ must give treating sources more weight because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). In the present case, the ALJ's articulated reasons for discrediting Dr. Graham's opinion do not constitute "good cause" for giving it little weight because substantial evidence does not support his reasons.

The fact that Dr. Graham noted on a few visits that the claimant's range of motion was normal does not contradict his finding that the claimant's pain was present to such an extent as to distract her from adequately performing daily activities or work. The claimant can experience continued chronic pain while having occasional notations of normal range of motion upon examination. During Dr. Graham's years of treating the claimant, he continued to prescribe narcotic medications to control her pain, and ordered a surgical epidural in 2013, indicating that he deemed her pain significant. Dr. Graham, as a pain specialist who treated the claimant for many years, was in the unique position to give insight into the claimant's allegations of pain and other symptoms.

Also, the court finds that Dr. Graham's notations on his "Clinical Assessment of Pain" in January 2014 bolster his credibility.  Dr. Graham gave his opinion that the claimant's pain was severe enough to *distract* her from her ability to carry out her daily activities or to work. However, he noted that he could not answer the exact extent to which her pain impacted her ability to work without a formal Functional Capacity Evaluation of the claimant.  Interestingly, the court notes that the ALJ ordered two consultative *mental* evaluations of the claimant, but ordered no consultative *physical* evaluation of the claimant to ascertain a doctor's medical opinion about the claimant's functional capacity limitations given the claimant's 2010 MRI and continued complaints of chronic pain for several years.

Moreover, the findings on the 2010 MRI support the claimant's continued complaints to her *treating* physicians Dr. Robinson and Dr. Graham over the course of many years about her continued chronic back pain that radiated down her right leg, muscle spasms, numbness, and tingling.  Dr. Richardson noted tenderness and pain with range of motion on several occasions in 2010 and 2011, and Dr. Graham continued to treat the claimant with narcotic medications for her severe back pain in 2012 and 2013, along with a surgical epidural procedure in 2013.  The notes on the surgical epidural procedure in April 2013 indicated that the claimant had "lumbar spondylosis, disc disease, and sacralized L5."  Neither Dr. Richardson nor Dr. Graham ever questioned the claimant's allegations of pain over the course of many years.

As discussed above under the pain standard issue, the claimant's daily activities cannot serve as adequate grounds to discredit Dr. Graham's opinion.  The court finds that

the ALJ's articulated reasons for disregarding Dr. Graham's opinion lack merit and substantial evidence does not support them.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED to the Commissioner for reconsideration.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 23rd day of March, 2017.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE